UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JEFFREY A. BRONSTER, PC
570 West Mt. Pleasant Avenue
Livingston, New Jersey 07039
(973) 740-2380
Attorney for the Plaintiffs

---

| | | |
|---|---|---|
| AL-GHENA INTERNATIONAL CORP. and SHAIRCO NEW JERSEY (as assignee of Shairco for Trading, Industry and Contracting), | : : : : | Civil Action No. |
| Plaintiffs, | : : | |
| vs. | : : | **VERIFIED COMPLAINT** |
| TALAT RADWAN, JASON RADWAN, CORTEZ HOLDING GROUP, INC., and JOHN DOES 1-10 (being fictitious names), | : : : : | |
| Defendants. | : : | |

---

The plaintiffs, by way of Complaint against the defendants, hereby state as follows:

## **INTRODUCTION**

1. This is an action by the corporate owners of two-thirds of the membership interest of a Florida limited liability company, Cortez Property Development, LLC, to compel the corporate owner of the remaining one-third membership interest, and the individuals who control it, to comply with their obligations of production and disclosure of the books and records of the company, and other documents and information to which the plaintiffs are entitled. Plaintiffs seek declaratory and injunctive relief compelling the production of such records and information, primarily so that they may determine what use has been made of the twelve million dollars that they collectively invested in the company for certain specific and limited purposes.

**PARTIES**

2. Plaintiff Shairco New Jersey is a New Jersey limited liability company having its principle place of business at 986 River Road, Edgewater, New Jersey 07020.

3. Shairco New Jersey is a plaintiff in this action as assignee of the rights of Shairco for Trading, Industry and Contracting ("Shairco"), a corporation of the Kingdom of Saudi Arabia.

4. Plaintiff Al-Ghena International Corp. ("Al-Ghena") is a corporation of the Commonwealth of Dominica, having its principle place of business in the State of Kuwait at Fahed Al Salem Street, Al-Nassar Tower, Al-Qibla, Kuwait.

5. Defendant Cortez Holding Group, Inc. ("Cortez") is a Florida corporation having its principle place of business at 26371 Avery Parkway, Mission Viejo, California 92962.

6. Defendant Talat Radwan, a resident of the state of California, is an owner of Cortez Holding Group, Inc., and exercises control over the operations of the company.

7. Defendant Jason Radwan, the son of Talat Radwan, is a resident of the state of California, who exercises control over the operations of Cortez Holding Group, Inc., and who upon information and belief is an owner of the company.

8. John Does 1-10 are individuals whose names are not presently known, including accountants, attorneys, and others, who are employed or otherwise associated with Cortez, and who participate with the Radwan defendants in the operation and control of the company known as Cortez Property Development, LLC.

9. Cortez Property Development, LLC ("the LLC"), which is not named herein as a party, is a limited liability company of the state of Florida, having its principle place of business at 3500 Powerline Avenue, Oakland Park, Florida 33309.

## JURISDICTION

10. This Court has jurisdiction over this action on the basis of diversity jurisdiction, pursuant to 28 U.S.C. § 1332, inasmuch as all plaintiffs are citizens of different states or countries from all defendants.

11. The amount in controversy between the parties, exclusive of interest and costs, exceeds the jurisdictional amount of $75,000.

## FIRST CAUSE OF ACTION

(Declaratory and Injunctive Relief)

12. The plaintiffs hereby reallege and incorporate all previous allegations of this Verified Complaint as though fully set forth herein.

**A.   Background**

13. In or about 2007, Talat Radwan approached Shairco and Al-Ghena to solicit their participation in a business venture, the purpose of which was to acquire certain real estate in Florida and, with the assistance of bank financing, build a hotel on the site.

14. During the course of negotiations, Talat Radwan and a representative and authorized agent of Shairco had various meetings in the state of New Jersey to discuss the prospect of joining in the venture.

15. As Talat Radwan explained the venture to the plaintiffs at the time of their negotiations, Morton Katz was the owner of a Florida company known as Cortez Property Development, LLC, which in turn was the owner of real estate located at 2926 Cortez Street in Fort Lauderdale, Florida. Radwan further explained that the real estate owned by the LLC was to be developed as part of what came to be referred to as the "Cortez Hotel Project."

16. Radwan proposed that the three companies each put up an initial investment of six million dollars, so that the LLC could be purchased for a total of $18,000,000, with each company to be the owner of one-third of the membership interest in the LLC.

17. In December 2007, based on Radwan's representations, including the specific representation that each company would immediately invest the sum of six million dollars for the purchase of the LLC, Shairco and Al-Ghena executed a document, together with Cortez, captioned as "Operating Agreement for Cortez Property Development, LLC."  (Appendix, pp. 1-26)

18. Page 25 of the Operating Agreement bore the heading, "Initial Member Contribution," and reflected that each of the three companies was to make an Initial Capital Contribution of six million dollars.

19. Al-Ghena and Shairco, following the instructions of Talat Radwan, each transferred six million dollars into an escrow account, to be used to purchase the LLC.

20. Thereafter, in or about 2008, the three companies did in fact purchase 100% of the ownership of the LLC, for what Al-Ghena and Shairco believed, based specifically on the representations of Talat Radwan, was the total sum of $18,000,000.

21. Pursuant to the agreement among the three companies, Talat Radwan - - who was the only principal residing in the United States - - was to oversee the next stage of the operation, which was the obtaining of bank financing for the construction of the hotel.

22. For over a year after the acquisition of the LLC, Al-Ghena and Shairco received no information as to the status of the project, and assumed that Talat Radwan was still engaged in the process of seeking financing for the construction of the hotel.

23. All during that time period, Al-Ghena and Shairco believed, based upon the express representations made by Radwan and the Operating Agreement that he had tendered to them, that each of the three companies had actually contributed six million dollars towards the total purchase price of the LLC.

**B.     The Operating Agreement:  Relevant Provisions**

24. The Operating Agreement was prepared by Talat Radwan or someone acting on his behalf, and was presented by him to Al-Ghena and Shairco.

25. The Operating Agreement was intended to govern the operations of the LLC according to delineated guidelines, and was relied upon by Al-Ghena and Shairco.

26. Although the Operating Agreement is dated December 12, 2007 "for reference purposes only," it contains the following preamble:

> This Operating Agreement becomes effective upon the completion and conversion of the construction financing into permanent financing for the Building located at 2926 Cortez Street, Fort Lauderdale, Florida.  The projected completion date of the Cortez project shall be on or around March 1, 2010.

27. The condition precedent to the Operating Agreement becoming effective, namely, the obtaining of certain financing, never took place.  Therefore, the present legal status of the Operating Agreement, and the extent to which its various provisions are presently in effect, is uncertain, pending a determination by the Court.

28. Notwithstanding the foregoing, the Operating Agreement does specifically state that it was entered into by the Members "in order to form and provide for governance of the Company and the conduct of its business and to specify their relative rights and obligations."

29.  Paragraph 1.23 of the Operating Agreement defined the term "Manager" as being "the Person coordinating the day-to-day affairs of the Company, with the responsibilities as shown in Article V of this Agreement."

30.  Paragraph 2.7 of the Operating Agreement identified the Initial Manager as "Cortez" - - that is, Cortez Holding Group, Inc. - - "thorough its duly authorized officer or representative." Pursuant to Paragraph 5.4 of the Operating Agreement, the Manager had a fiduciary duty to the Members of the LLC.

31.  Paragraph 2.8 of the Operating Agreement, captioned "Purchase Price," consistent with what Talat Radwan had represented to the plaintiffs, included the following statement: "The down payment for the Cortez Property Development, LLC will be eighteen million dollars."

32.  Under Article III, "Capitalization," Paragraph 3.1 of the Operating Agreement ("Initial Contribution") included the following statement: "Each member shall initially contribute the consideration described for that Member set forth on Exhibit B attached hereto at the time and in the manner specified on Exhibit B."

33.  Although the attachment to the Operating Agreement was actually labeled as "Exhibit A" rather than "Exhibit B," it did in fact reflect that each of the three companies would make an equal initial contribution of six million dollars.

34.  Paragraph 3.3 of the Operating Agreement required that a separate Capital Account be maintained for each of the three member companies; however, the plaintiffs have no knowledge of such accounts being maintained, and have not been provided with any information confirming the existence of, or detailing the transactions occurring in, such accounts.

35. Paragraph 3.5 of the Operating Agreement stated as follows: "No Member shall have priority over any other Member with respect to the return of a Capital Contribution, or distributions or allocations of income, gain, losses, deductions, credits, or items thereof."

36. The compensation to be received by Cortez, or any subsequent Manager, on account management services was specifically delineated in Paragraph 5.6 of the Operating Agreement, titled "Manager Compensation":

> The Manager shall be entitled to any compensation for services performed as voted from time to time by a Unanimous Vote of the Members.

37. At no time from the date of the execution of the Operating Agreement through the date of the filing of this Verified Complaint did the Members ever vote to authorize any compensation to Cortez or to Radwan for management services.

38. Paragraph 5.10 of the Operating Agreement, captioned "Company Accounts," contained the following requirement:

> All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, as such locations shall be determined by a Majority of the Members. Withdrawal from such accounts shall require the signature of such person or persons as a Majority of Members may designate.

39. At no time were the plaintiffs, who together constitute a majority of the Members, consulted by Cortez as to the financial institutions to be approved, or as to the signatures to be required for the withdrawal of company money from accounts.

40. Nevertheless, acting through Talat and Jason Radwan, Cortez exercised unrestricted control over company funds, and withdrew such funds as they wished, for such purposes as they themselves decided upon, without the knowledge, consent, or approval of the plaintiffs.

41. Paragraph 6.2 of the Operating Agreement enumerated substantial restrictions on the power and authority of the Manager, stating the following:

> Notwithstanding anything contained in Article V, the Manager shall not take any of the following actions on behalf of the Company, unless a Majority or Members consent to the taking of such action:
>
> (a) any act which would make it impossible to carry on the ordinary business of the Company;
>
> (b) any confession of a judgment against the Company;
>
> (c) the disposition of all or a substantial part of the Company's assets not in the ordinary course of business;
>
> (d) the incurring of any debt no in the ordinary course of business.

42. At no time did the plaintiffs, who together constitute a majority of the Members of the LLC, consent to the taking of any action by Cortez in violation of Paragraphs 6.2 (a) through (d) of the Operating Agreement.

43. Paragraph 11.18 of the Operating Agreement, captioned "Prevailing Party," contains the following provision:

> If any legal action, arbitration or other proceeding is commenced arising out of this Agreement, the prevailing party shall be entitled to an award of its attorneys' fees and expenses, including expert witness fees and costs. The phrase "prevailing party" shall include a party who receives substantially the relief desired whether by dismissal, summary judgment, judgement or otherwise.

44. In addition to all other relief requested herein, the plaintiffs seek an award of costs and fees pursuant to Paragraph 11.18 of the Operating Agreement.

## C.     The Operating Agreement:  Record-Keeping Provisions

45.   Article IX of the Operating Agreement ("Books and Records") contains specific provisions for the maintenance and inspection of the books and records of the LLC.

46. Paragraph 9.2 of the Operating Agreement states, in relevant part:

> A balance sheet and income statement of the company shall be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement.

47.   Notwithstanding the provisions of Paragraph 9.2 of the Operating Agreement, the plaintiffs have never been provided with a copy of any balance sheet or income statement, nor have they even received any confirmation of the existence of such documents.

48. Paragraph 9.4 of the Operating Agreement, captioned "Tax Information," contains the following requirement:

> Within 75 days after the end of each taxable year of the Company, the Company shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns, and a copy of the Company's federal, state and local income tax or information returns for such year.

49.   Notwithstanding the provisions of Paragraph 9.4 of the Operating Agreement, neither plaintiff has ever received a copy of any of the tax-related documents described in therein.

50. Paragraph 9.3 of the Operating Agreement, captioned "Record Maintenance," contains the following provisions:

> At all times during the term of existence of the company and beyond that term if all the Members deem it necessary, the Members shall keep or cause to be kept the books of account referred to in Section 9.2 ["Accounting Method"], and following:

 (a) a current list of the full name and last known business or residence address of each Member, together with the Contribution and the share in Profits and Losses of each member;

 (b) copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

 (c) executed counterparts of this Agreement, as amended;

 (d) any powers of attorney under which the Articles of Organization or any amendments thereto were executed;

 (e) financial statements of the Company for the six most recent fiscal years, and,

 (f) the books and records of the Company as they relate to the Company's internal affairs for the current and post fiscal years.

51. Notwithstanding the provisions of Paragraph 9.3 of the Operating Agreement, and despite requesting access to the company records, neither plaintiff has ever seen the books and records of the LLC, or received confirmation that they in fact exist.

52. Paragraph 9.1 of the Operating Agreement, captioned "Inspection Rights," contains the following provision:

> Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying by each Member or the Member's authorized representative on reasonable Notice during normal business hours. The costs of such inspection and copying shall be borne by the Member requesting inspection and copying.

53. Upon information and belief, based upon statements made by Jason Radwan, any records of the LLC that do exist are not being maintained at the executive office of the Florida company, but are in the possession of the defendants in California.

54. The plaintiffs have demanded that the defendants identify all of the LLC books and records, and provide them access to them pursuant to their right of inspection as set forth above, pursuant to the Florida Limited Liability Company Act, and pursuant to such common law and other rights as the plaintiffs may have, as the majority shareholders of the LLC to conduct an inspection.

55. Notwithstanding the foregoing, the defendants have refused to comply with the plaintiffs' requests, as set forth in greater detail herein.

56. Paragraph 9.2 of the Operating Agreement ("Accounting Method"), which was quoted in part above, also contains the following provision: "A Third (3rd) party Auditor may be used at any time by any of the Members at their own expense."

57. Notwithstanding the foregoing, the plaintiffs have been unable to have the company's books and records audited because of the refusal of the defendants to grant access to them.

## D.  The First Evidence of Misuse of Funds

58. On September 18, 2008, Jason Radwan sent an email to the plaintiffs, attaching a letter on his company's letterhead from "John Briggs," identified as "project manager."  (App., p. 27)

59. The Briggs letter described the status of the Cortez Hotel project, and the further plans for development in the coming months.

60. On April 6, 2010, after ignoring repeated requests from the plaintiffs for information, Jason Radwan sent an email to the plaintiffs which attached a letter from Talat Radwan, explaining the status of the Cortez Hotel Project.  (App., p. 29)

61. The letter stated that the hotel project had experienced difficulties because of the economy, but expressed his anticipation that the project would still able to go forward.

62. The plaintiffs received no further updates from the defendants, and on August 16, 2010, the Board of Directors of Al-Ghena requested a meeting of the Members to discuss an exit strategy from the Cortez Hotel project and the LLC itself, so that Al-Ghena could invest its money elsewhere. (App., p. 31).

63. In that email, Al-Ghena mentioned the initial $18,000,000 investment, reflecting the belief that both plaintiffs still held as of that date that each of the three companies had put up $6,000,000 as an initial capital contribution.

64. The emails that were exchanged thereafter reflected the plaintiffs' increasingly urgent requests for a meeting, and the evasive responses of the defendants.

65. On September 1, 2010, Jason Radwan sent an email to the plaintiffs disclosing, for the first time, that he and his father had used the LLC's funds for purposes unrelated to the Cortez Hotel Project. (App., p. 32)

66. The email, which was prefaced with the statement, "I'm not sure if you were ever informed," went on to state that as far back as 2009, the defendants had used LLC money to purchase another piece of property, although it provided no details about the property, and gave no explanation of what authority the defendants claimed to have to direct LLC funds to investments outside the scope of the Cortez Hotel project.

67. Jason Radwan subsequently sent the plaintiffs a document he had prepared, titled "Cortez Project Investment Summary." (App., pp. 33-36)

68. The document was significant in that it perpetuated, on the one hand, certain statements by the defendants that the plaintiffs now believe to be false, and on the hand, made a disclosure of extensive uses of LLC funds that were not contemplated by the Operating Agreement, that were not

related to the Cortez Hotel project, and that were never discussed with or authorized by either of the plaintiff companies.

69. In the first paragraph, the Summary stated, "Our Group put a down payment of $18,000,000 USD towards the purchase price of $75,000,000 for the finished Hotel Project . . ."

70. That statement was intended by the defendants to perpetuate the plaintiffs' belief that the plaintiffs still held at that time that Cortez had matched the $6,000,000 capital contribution of the other two companies as was required by the terms of their agreement, and as was memorialized in the Operating Agreement.

71. The Summary did disclose, for the first time, that the purchase price of the LLC was actually not $18,000,000, as the plaintiffs had previously been told. The letter stated, "Of the $18,000,000 down payment the Group paid $10,000,000 USD to purchase the stock for the company Cortez Property Development, LLC from Mr. Katz in 2008."

72. This statement, on the one hand, was yet another confirmation that Cortez, like the other two Member companies, had supposedly put $6,000,000 into the LLC, and on the other hand was the first disclosure by the defendants that the LLC had actually been purchased for eight million dollars less than they had been told.

73. The Summary continued, "The remaining capital was/is to be used for Architectural/ Engineering, Soft Costs, Legal Costs, and Equity needed to contribute to finalize the Construction Loan and ultimately obtain the financing needed to finish the project."

74. The Summary went on to state that the defendants had used the LLC money for a series of unrelated business ventures, including the acquisition of two pieces of real estate, and investment in a "foreclosure fund."

75. At no time prior to any such investment did the defendants notify the plaintiffs of their intentions, or seek their consent to use LLC funds for projects unrelated to the Cortez Hotel project; nor have they at any time since provided to the plaintiffs the documents and information necessary to even verify that such investments were actually made, what use was made of the LLC money, and how much, if any of that money is still in the possession or control of the defendants.

76. At no time did either plaintiff know of, agree to, approve, or ratify any such uses of LLC funds, and all actions in that regard were taken unilaterally by the defendants.

77. After learning that the purchase price of the LLC was only $10,000,000, the plaintiffs attempted to ascertain exactly what use had been made of the remaining eight million dollars that they believed to represent the initial capitalization.

78. The plaintiffs ultimately concluded that Cortez had failed to make its 1/3 contribution at all, and that any money actually used by the defendants, either for the Cortez Hotel project or any of the other supposed investments described in the Summary, was the $12,000,000 that had been put into the company by the plaintiffs.

79. The defendants, when confronted by the plaintiffs with this belief, admitted that it was true. Jason Radwan stated that Cortez was actually not required to put its $6,000,000 into the company, but refused to explain why.

80. In the months that followed, the plaintiffs consulted with attorneys, conducted such investigations as they could, and continued to demand information and meetings.

81. Despite these efforts, the defendants never provided the information that the plaintiffs needed and were legally entitled to, and the plaintiffs were not successful in discovering what use had actually been made of their money,

**E.  The Events Leading up to this Lawsuit**

82.  On November 2, 2011, plaintiffs' counsel wrote to Talat Radwan and to Jason Radwan, requesting access to, and inspection of, the books and records of the company.  (App., pp. 37-39)

83.  On November 9, 2011, Jason Radwan left a voicemail message for plaintiffs' counsel, and followed up the next day with an introductory email.  (App., p. 40)

84.  After an exchange of emails (App., pp. 40-44), on November 11, 2011, Radwan and plaintiffs' counsel had a telephone conversation regarding the request to inspect the records.  Plaintiffs' counsel offered to travel to California or to Florida, as might be necessary, to conduct the inspection, or to allow the defendants to either bring or send copies of the documents to New Jersey.  Radwan promised to call counsel back with a decision.

85.  On November 15 ,2011, having not heard back from Jason Radwan, plaintiffs' counsel initiated a call to him, and inquired about the inspection.  Radwan stated that he was first intended to hire an attorney, have him organize and go through all of the documents, and then contact me at some later point to discuss what documents the defendants would or would not produce.  Plaintiffs' counsel documented the conversation in detail in an email sent that same day.  (App., p. 45)

86.  On November 20, 2011, plaintiffs' counsel received a telephone call from Jason Radwan, who now agreed to copy documents and send them to New Jersey.

87.  Radwan went on to state, as he had in the original telephone conversation, that the books and records requested were very extensive and, and that he needed time to "organize" them.

88.  Plaintiffs' counsel instructed him to overnight whatever documents he could, and to continue producing documents as he continued to organize them, and Radwan agreed to call him back to advise as to the progress of the production.

89. Plaintiffs' counsel did not receive the promised telephone call, which led to a further exchange of emails. (App., pp. 47-49)

90. In that exchange, plaintiffs' counsel also requested a written explanation as to why the defendants had never put their $6,000,000 into the LLC. As of the date of the filing of this Verified Complaint, the defendants have never answered that question.

91. Finally, on or about November 30, 2011, plaintiffs' counsel received an overnight package from the defendants containing a CD-Rom disk.

92. The disk contained 13 files in .pdf format, of which 12 could be opened; two folders apparently containing photographs of the hotel site, which could be only partially opened; and a large folder in compressed ("zip") format that was corrupted, and which could not be opened at all, despite the use of software specifically designed for that purpose.

93. None of the 13 files in .pdf format were financial documents, and in no way were they, or the folders with photographs, responsive to the plaintiffs' demand to inspect the books and records of the company.

94. In a letter dated December 6, 2011, which was emailed on that date to Jason Radwan, plaintiffs' counsel detailed all of the files on the disk, the problems with the compressed files, and the lack of relevance of the files that could be opened. (App., pp. 50-52)

95. In that letter, counsel also requested an immediate response to certain questions:

" (1) What documents were contained in the compressed file? Specifically, were there financial documents, such as bank statements and tax returns? If so, please list them in detail.

"(2) Will you, before the end of the week, have the documents from the compressed file sent to me again on a new disk (or disks) in readable form?

> "(3) Will you allow me to come to your office in California next week to review <u>all</u> of the financial records, which includes not only the records of Cortez Development, but of any other company that received and/or used Cortez funds, such as for the purchase of other properties or for your mortgage venture?"

96. By December 12, 2011, plaintiffs' counsel had received no response whatsoever from Radwan, and a new exchange of emails ensued. (App., pp. 53-55)

97. During the course of the exchange of emails, Radwan excused his failure to respond by stating that a representative of Al-Ghena, Ihab Hakim, was "in contact with us and he is coming to our office to meet to see if anything can be resolved as he is in the U.S. still."

98. Radwan's statement, which was intended to imply that Mr. Hakim had contacted him and set up a meeting to discuss a settlement, was false. In fact, Radwan had repeatedly called Mr. Hakim trying to set up a meeting so as to delay the production, but Mr. Hakim neither agreed to, or participated in, any such meeting.

99. Indeed, in the course of those telephone calls, Radwan threatened Mr. Hakim that if plaintiffs' counsel continued to be aggressive in pursuing the inspection of the books and records, he and his father would simply put the LLC into bankruptcy.

100. As of the date of the filing of this Verified Complaint, Jason Radwan has not contacted plaintiffs' counsel again, answered any of counsel's questions, or provided any documents.

**F. The Plaintiffs Have No Adequate Remedy at Law**

101. Based upon all of the events described above, the plaintiffs believe that they have been victimized by the defendants, and that they have causes of action against them that include, but may not be limited to, the following: violation of the federal RICO statute; violation of the New Jersey RICO statute; violation of the Florida Civil Remedies for Criminal Practices Act; fraud;

embezzlement; conversion; breach of fiduciary duty; and violation of the relevant provisions of Section 608, Florida Statutes. (App., pp. 56-63)

102. However, the plaintiffs' ability to assess the conduct of the defendants, and to determine whether such causes of action exist and can be proven by a preponderance of the evidence, has been frustrated by the refusal of the defendants to provide the requested documents.

103. The production by the defendants of the financial records of the company to other Members of the company, who collectively are majority shareholders of the company is not discretionary; it is an obligation imposed upon them by contract, by statute, and by common law.

104. In the absence of the financial information to which they are entitled, the plaintiffs cannot pursue whatever remedies they may have at law, and must therefore invoke the equitable powers of the Court to issue such injunctive relief as may be necessary to ensure full compliance by the defendants.

105. However, given the volume of documents that presumably exist, the calculated strategy of the defendants to avoid production, the urgency of the plaintiffs' need for the financial records they are seeking, and the complexity of the production due to the transfers of money into projects and companies that the plaintiffs cannot even presently identify, the plaintiffs do not believe that the issuance of an injunction will be sufficient to ensure full compliance in the foreseeable future.

106. The plaintiffs also anticipate, based upon the conduct of the defendants to date, that any compliance on their part will be partial at best and useless at worst, creating a burden not only on the plaintiffs but on the Court as well, as each dispute will necessarily have to be brought before the Court for resolution.

107. Accordingly, in addition to any other relief sought herein, the plaintiffs are asking the Court to appoint a Master to oversee the production, to rule on any disputes, and to determine the full scope of the documents to which the plaintiffs are entitled so as to obtain a full and accurate accounting of the millions of dollars that they invested in the LLC.

WHEREFORE, plaintiffs demand judgment for the following:

A. A declaratory judgment declaring that the defendants are in breach of their statutory and common law obligations;

B. Preliminary and permanent injunctive relief compelling the defendants to produce certain records, to provide an accounting, and to provide such other information as plaintiffs may be deemed to be entitled to;

C. Preliminary and permanent injunctive relief prohibiting the defendants from exercising control over the assets and the operation of Cortez Property Development, LLC;

D. Awarding plaintiffs the costs of this action, including reasonable legal fees, pursuant to the terms of the Operating Agreement; and

E. Such other and further relief as the Court may deem just and proper.

Dated:   Livingston, New Jersey
            January 2, 2012

/s/ *Jeffrey A. Bronster*
_____
JEFFREY A. BRONSTER, PC
570 W. Mt. Pleasant Avenue
Livingston, New Jersey 07039
(973) 740-2380
jbronster@bronsterlaw.com
Attorney for the Plaintiffs

## VERIFICATION

I, Ihab Hakim, of full age, do hereby declare that I have read the foregoing Complaint and state that the allegations in it are true based on my personal knowledge. I verify under penalty of perjury that the foregoing is true and correct.

/s/ *Ihab Hakim*
_____
IHAB HAKIM

DATED:   January 2, 2012


## VERIFICATION

I, Jeffrey A. Bronster, of full age, do hereby declare that I have read the foregoing Complaint and state that the allegations contained in Paragraphs 82-97 are true based on my personal knowledge. I verify under penalty of perjury that the foregoing is true and correct.

/s/ *Jeffrey A. Bronster*
_____
JEFFREY A. BRONSTER

DATED:   January 2, 2012