**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **AL-GHENA INTERNATIONAL CORP. and SHAIRCO NEW JERSEY (as assignee of Shairco for Trading, Industry and Contracting),** : | Civil Action No. 12-cv-0047 (KM) |
| **Plaintiffs,** : | **OPINION AND ORDER** |
| **v.** : | |
| **TALAT RADWAN, JASON RADWAN, CORTEZ HOLDING GROUP, INC., CORTEZ PROPERTY DEVELOPMENT LLC; and JOHN DOES 1-10 (being fictitious names),** : | |
| **Defendants.** : | |

**MCNULTY**, District Judge

     This matter comes before the Court upon Defendants' Motion to Dismiss the Amended Complaint for lack of personal jurisdiction over the Defendants pursuant to Federal Rule of Civil Procedure 12(b)(2), or, in the alternative, to dismiss or transfer for improper venue pursuant to Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a). The Complaint alleges violations of federal and New Jersey RICO laws and Florida's Civil Remedies for Criminal Practices Act, as well as various related common law causes of action, including fraud, conversion, conspiracy, breach of fiduciary duty, and unjust enrichment. Plaintiffs' claims all arise from a soured business deal to develop a boutique hotel in Fort Lauderdale, Florida.

     For the reasons set forth below, I find that the Defendants have satisfactorily established that the District of New Jersey is an improper venue for this action. In addition, Plaintiffs have not met their burden of establishing that the Court has *in personam* jurisdiction over the Defendants. "A court without personal jurisdiction over the defendants or venue over a case has the option of dismissing the action or transferring the case to another district pursuant to 28 U.S.C. § 1406(a)." *China Am. Co-op. Auto., Inc. v. Estrada Rivera Enterprises Corp.*, 2008 WL 305744 (D.N.J. Jan. 28, 2008) (citing

*Goldlawr v. Heiman,* 369 U.S. 463 (1962)). As I find that the Southern District of Florida is an appropriate venue for this action and that a district court sitting there will likely have personal jurisdiction over the Defendants, I will transfer this action to the United States District Court for the Southern District of Florida.

## I.   Factual Background

### A. The Parties

Plaintiffs in this case are essentially two foreign investment entities. Plaintiff Al-Ghena International Corp. ("Al-Ghena") is incorporated in the Commonwealth of Dominica with a principal place of business in Al-Qibla, Kuwait. Amended Complaint, February 7, 2012, ECF No. 8 ("AC" or "Complaint") at 2.[1]  Plaintiff Shairco New Jersey LLC ("Shairco NJ") is a limited liability company formed under the laws of New Jersey with a principal place of business in Edgewater, NJ. *See id.* Shairco NJ has a single member, Shairco for Trading, Industry and Contracting ("Shairco SA"), an entity incorporated in the Kingdom of Saudi Arabia. *Id.* Shairco NJ sues as "an assignee of the rights of" Shairco SA. *Id.* Shairco SA is a privately-held entity owned by a Saudi national named Mostafa Alshair ("Alshair") and his two brothers. *See* Affirmation of Mostafa Alshair in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint, June 11, 2012, ECF No. 18-1 ("Alshair Aff.") ¶¶ 4-6.

Both corporate Defendants, Cortez Holding Group, Inc. ("Cortez Holding") and Cortez Property Development LLC ("Cortez LLC"), are entities formed under the laws of Florida, and each has its principal place of business in Mission Viejo, California. AC at 2. Individual Defendants Talat Radwan ("Talat") and Jason Radwan ("Jason") (Talat's son) are residents of California and are principals of Cortez Holding. *See* AC at 2.

### B. The Dispute

This dispute arises out of a failed business venture to acquire and develop real property in Fort Lauderdale, Florida. Plaintiffs allege that Talat approached Shairco and Al-Ghena in 2007 to solicit their investment for a down payment to buy Cortez LLC, an already-existing entity that owned property which, with the assistance of bank financing, was to be developed into

---

[1]    Because the Amended Complaint is not numbered consecutively (each new section begins at paragraph one), all citations to the Amended Complaint will refer to page numbers.

a boutique hotel owned and operated by the LLC (the "Cortez Project"). *See* AC at 3-4.

Talat proposed that each investor (Shairco, Al-Ghena and Cortez Holding) make an initial contribution of $6 million USD, giving each company a one-third membership interest. *Id.* In December 2007, Plaintiffs executed the "Operating Agreement for Cortez Property Development, LLC" (the "Agreement"),[2] which provides that Cortez LLC, at least initially, would be managed by Cortez Holding "through its duly authorized officer or manager." *See* § 2.7 of the Agreement, included in the Appendix to Plaintiffs' Verified Complaint, January 3, 2012, ECF No. 1-1 ("Appendix"). As agreed, Al-Ghena and Shairco each transferred $6 million USD into an escrow account. AC at 4. Plaintiffs allege that Cortez Holding was also required to, but failed to, transfer its $6 million USD contribution into the escrow account. *See id.* Defendants eventually disclosed that only $10 million USD was used for the initial purchase of shares, while the remaining capital was to "be used for Architectural/Engineering, Soft Costs, Legal Costs, and Equity needed to contribute to the Construction Loan and ultimately obtain the financing to finish the project." *See* Appendix to Plaintiffs' Verified Complaint, January 3, 2012, ECF No. 1-1 ("Appendix") at 33.[3]

―――――――――――――――

[2]     As Plaintiffs point out in their Complaint, *see* AC at 5-6, there is an open question as to whether the Operating Agreement ever came into full force and effect. The Agreement was executed by representatives from each of the three partner companies on December 12, 2007, but it includes the following preamble:

> This Operating Agreement becomes effective upon the completion and conversion of the construction financing into permanent financing for the Building located at 2926 Cortez Street, Fort Lauderdale, Florida. The projected completion date of the Cortez project shall be on or around March 1, 2010.

*See* Appendix to Plaintiffs' Verified Complaint, January 3, 2012, ECF No. 1-1 ("Appendix"), at 4. As discussed in more detail below, Defendants were never able to obtain financing for the Cortez Project. Plaintiffs did, however, make a $12 million USD investment pursuant to the terms of the Agreement.

[3]     The source of this information is an undated document entitled by Plaintiffs as "Cortez Project Investment Summary prepared by Jason Radwan." It is not clear whether it materialized as an attachment to the preceding email from Jason Radwan of September 1, 2010, *see* Appendix at 32, or as a stand-alone document. In any event, it provides the most detailed explanation of the Cortez Project's initial investment plan:

> The Cortez Hotel project was purchased . . . as a stock transfer in 2008 from Cortez Property Development, LLC. The company Cortez Property

Thereafter, Cortez Holding, acting as the manager of the Cortez Project, sought financing and permits to begin construction on the hotel. Defendants maintain that Cortez Holding, "on behalf of the LLC, submitted development applications to the City of Fort Lauderdale to advance the Florida development project and expected to obtain approval for the development. However, the City denied approval for the development." Defendants' Brief in Support of Motion to Dismiss the Amended Complaint or in the Alternative to Transfer Venue, May 4, 2012, ECF No. 14-1 ("Def. MTD") at 4. Defendants also maintain that Florida's declining real estate market and decreasing tourism contributed to the Cortez Project's troubles. *See id.* Once the Cortez Project stalled, in 2009, Cortez Holding bought an alternative property, the "Breakers Hotel Project"; repaired the Cortez Property's existing rental units to generate rental income; and "invested the remaining capital in a 'Foreclosure Fund,'" intended "to help

---

Development, LLC was previously owned by Mr. Morton Katz, who assembled and purchased just the raw land in 2 separate transactions for approximately $6,250,000 in 2005/2006. Our Group purchased this 200+ room Hotel Project in early 2008 as a stock transfer, buying the shares of the company from Mr. Katz and had to finish the Approval process to finalize the Hotel Project Approval. The reason for buying the existing company was so there would not be any reassessment of taxes for the new purchase. Of the $18,000,000 down payment the Group paid $10,000,000 USD to purchase the stock for the company Cortez Property Development, LLC from Mr. Katz in 2008. The remaining capital is/was to be used for Architectural/Engineering, Soft Costs, Legal Costs, and Equity needed to contribute to the Construction Loan and ultimately obtain the financing to finish the project.

Appendix at 33.

Plaintiffs maintain that these details were not known to them until they received this document sometime in 2010. *See* AC at 11-14. The Agreement provides a breakdown of the purchase price which stipulates a down payment of $18,000,000 USD:

Purchase Price: The total purchase price upon completion as a condo-hotel will be seventy-five million dollars ($75,000,000). The down payment for the Cortez Property Development, LLC will be eighteen million dollars ($18,000,000). The approximate balance of +/- fifty-seven million dollars ($57,000,000) will be financed with a loan, with the best prevailing rates. Each member will be responsible for repayment of such loans.

Agreement § 2.7.

4

mitigate the Group's losses." *See* Appendix at 34.[4]  Defendants maintain that "Cortez Holding is diligently continuing to work to overturn the City Commission's decision, obtain fair value for the property, maintain the property, collect rents and find alternative methods to recoup some of the unrealized losses from the decrease in property values."  Def. MTD at 5.

Much of the foregoing is stated as background for understanding the parties' contentions with respect to venue and personal jurisdiction. The gravamen of the Complaint is that Cortez Holding never invested its $6 million share of the down payment as required by the Agreement, despite Defendants' representations otherwise; that despite Plaintiffs' repeated requests for information about their investments and the status of the Project, the Defendants failed to comply with their obligation to produce and disclose books and records of the LLC pursuant to the terms of the Agreement; and that Defendants have "used the plaintiffs' money in ways for which they had no permission or authorization, and have converted that money to their own use." *See* AC at 1.

---

[4]     Again, Plaintiffs maintain that they were not informed or consulted about these alternative investments at the time they were made. *See* AC at 11-14. However, Alshair also maintains that Jason Radwan approached him in 2009 about the idea of investing some of the LLC's money in "foreclosure investments," and that Alshair "specifically instructed him that he was not to do so." Alshair Aff. ¶¶ 53-54. *See* Pl. Opp. at 7. The "Cortez Project Investment Summary prepared by Jason Radwan," *see* Appendix at 33-36 and *supra* n.3, explains:

> We did 5 things to help mitigate our Group's losses and make the Investment more profitable. . . .
>    1) We purchased a 2nd Hotel Project Investment in the City of Fort Lauderdale, called Breaker's Hotel Project.
>    2) We cleaned up and repaired the existing the existing apartment units to rent them out to make some income at about $75,000 annually until we build.
>    3) We invested the remaining capital in a Foreclosure Fund.
>    4) We are looking at transferring from the Foreclosure Fund to a Shopping Center to ensure the high rate of return as the economy recovers and Foreclosures slow down.
>    5) We have also lowered the Purchase Price from $75,000,000 down to $60,000,000.

Appendix at 34.

### C. New Jersey Contacts

None of the Defendants maintain residential or business addresses, own property, pay taxes, or maintain bank accounts in New Jersey. Plaintiffs nonetheless maintain that Defendants repeatedly visited New Jersey in connection with the Cortez Project and other business ventures, and that these contacts with the State adequately establish a basis for venue and personal jurisdiction over the Defendants in this District.

According to Plaintiffs,

> Talat Radwan courted Shairco for years to invest money with him; many of those discussions took place in New Jersey, which for over a decade has been Shairco's home in the United States. He came to New Jersey on multiple occasions to meet with [Alshair] to solicit Shairco's participation in ventures both in and out of New Jersey, including for the [Cortez Project]. And both Talat and Jason Radwan came to New Jersey to meet with [Alshair] after the company had invested its money, for the specific purpose of perpetuating their scheme and of concealing their misconduct.

Pl. Opp. at 2. In his Affirmation, Alshair states that "[o]ver the past 12 years, I have personally come to New Jersey on behalf of Shairco many times. I estimate that on average I spend three to four months a year living in New Jersey and conducting Shairco business. . . ." Alshair Aff. ¶ 10.

Plaintiffs, however, offer few specifics about Talat Radwan's "multiple" business trips to New Jersey. Alshair maintains that "while I cannot provide more details as to the dates of [Talat's] visits without further research, I can say with certainty that they took place both before and after the signing of the Cortez agreement in December 2007." *Id.* ¶ 49. Alshair also recounts that Talat approached him about investing in other ventures, including the development of 154 acres in Voorhees, New Jersey, in 2004, and a waterfront townhouse development in Edgewater in 2007. *See id.* ¶¶ 37-44. Alshair maintains that Talat came to New Jersey at least once in 2004 and again in 2007 to discuss those potential ventures. *See id.* Alshair states that his relations with the Radwans were business-related, not personal; Alshair insists that he did not have "a single meeting or conversation in which [Talat] did not try to persuade me to invest my family's money in one project or another. . . ." *Id.* ¶¶ 45-46.

With regard to Jason, Plaintiffs maintain that "a significant meeting took place in New Jersey in 2009, when Jason Radwan came to Edgewater to meet with Mr. Alshair. He used the meeting to assure Alshair that everything was in

6

order, and that the only problems with the [Cortez] project were those caused by the declining economy . . . ." Pl. Opp. at 6. Plaintiffs submit that Jason's profession as a minor league baseball player caused him to "regularly" visit New Jersey, "perhaps as many or more than half-a-dozen times a year." *Id.* at 5, 11.

Both Radwans admit to visiting New Jersey in August 2009, but maintain that the purpose of the trip was a meeting with Toys R Us "that was completely unrelated to" the Cortez Project. *See* Declaration of Talat Radwan, May 4, 2012, ECF No. 14-3 ("Talat Decl.") at 14; Declaration of Jason Radwan, May 4, 2012, ECF No. 14-4 ("Jason Decl.") at 15. Talat also admits to visiting New Jersey "two or three other times since 2009," but maintains that the visits were "purely social" and that he "met with Mr. Alshair as part of [their] long social relationship." Talat Decl. ¶¶ 15-17.

In short, in the four years between December 2007, when the Agreement was signed, and January 3, 2012, when Plaintiffs filed their Verified Complaint, *see* ECF No. 1, Talat visited Alshair in New Jersey roughly two to five times. These were either visits in connection with the Cortez Project, or social visits during which business may have been discussed. Setting aside the August 2009 visit, which Talat maintains was "social," Plaintiffs have not provided any dates, times, locations, or agenda items for the "multiple" business meetings that allegedly occurred between Talat and Alshair in New Jersey. The parties seem to agree that Jason was in New Jersey just once during that four year period—also in August 2009—and that he met with Alshair at that time.

Plaintiffs' jurisdictional pleadings tend to focus, not on Defendants' connections with the forum, but on those of Alshair and Shairco SA:

> For more than a decade, Mr. Alshair has spent an average of three to four months a year in New Jersey, and in fact purchased apartments in Edgewater to accommodate his frequent stays in this country. He has conducted extensive business in New Jersey, often conducting meetings and negotiations at the Edgewater offices of Smart Realty, which has served as both a broker and partner for Shairco in various ventures. Because of the expansion of its New Jersey interests, Shairco recently formed the New Jersey company that serves as the plaintiff in this case, Shairco New Jersey.

Pl. Opp. at 4. In addition, Plaintiffs submit that Shairco S.A. had a joint venture with "Tasty Trim," a New Jersey company, and that "Shairco has also looked at and negotiated various other projects in New Jersey." *Id.* at 5. Though Plaintiffs admit that most of these investment opportunities have not

come to fruition, they maintain that "Shairco remains committed to expanding its business in New Jersey and the surrounding area, and Mr. Alshair has, if anything, been increasing his time here looking for and negotiating suitable projects." *Id.*

Defendants counter that neither Alshair nor Shairco S.A. is a citizen of New Jersey or a Plaintiff in this action; indeed, they contend, Shairco NJ was not even formed until 2011, in anticipation of this lawsuit,[5] and is suing as an assignee. According to Defendants, other than a few social visits and unrelated business trips over the years, they have no connections to New Jersey. *See* Def. MTD at 4-5. Moreover, the nexus of Plaintiffs' allegations is Florida: the Cortez Project property is located in Fort Lauderdale, Cortez Property Development LLC is formed under Florida law and has its registered agent there, and the Parties elected Florida Law to govern disputes arising from the Agreement. *Id.* at 2-3.

## II.   Discussion

Defendants have moved to dismiss Plaintiffs' Amended Complaint on the grounds that the alleged nature and frequency of Plaintiffs' contacts with New Jersey are insufficient to either create proper venue in New Jersey or establish personal jurisdiction over the Defendants. My analysis of the facts currently before the Court indicates that the District of New Jersey is not the proper venue for this action. I also find in the alternative, based on the Plaintiffs' pleadings, that it is unlikely that this Court has personal jurisdiction over the Defendants. Rather than imposing the "harsh remedy" of dismissing Plaintiffs' complaint, and because there is a clearly proper venue available, I will grant Defendants' motion pursuant to Fed. R. Civ. Proc. 12(b)(3) and transfer this action to the to the Southern District of Florida.

### A.   Venue

A party may move to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3). The movant has the burden of demonstrating that venue is improper. *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724-25 (3d Cir. 1982). The court generally accepts the allegations in the pleadings as true and

---

[5]   *See* Def. MTD at n.3. Mr. Alshair denies that Shairco NJ was formed solely for purposes of this litigation. *See* Alshair Aff. at ¶ 24. According to Mr. Alshair, he formed an NJ LLC in 2004, but allowed the LLC to lapse and continued doing business in New Jersey as Shairco S.A. Then, in 2011, "Shairco was advised by counsel that because its United States operations were continuing and expanding, it would be best to once again operate through an entity formed in the United States; and as New Jersey was the state where the company was based, we opened a New Jersey limited liability company, Shairco New Jersey, LLC." *Id.* at 25.

draws all reasonable inferences and resolves all factual conflicts in the plaintiff's favor. *Bockman v. First Am. Marketing Corp.*, 459 Fed. App'x 157, 158 n.1 (3d Cir. 2012).

The applicable venue statute provides:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28. U.S.C. § 1391(b).[6]

---

[6]    Initially, it is important to address the effect, or not, of the Jurisdiction and Venue Clarification Act of 2011. *See* Federal Courts Jurisdiction and Venue Clarification Act of 2011, PL 112-63, December 7, 2011, 125 Stat 758. Plaintiffs submit that the 2011 Amendments to 28 U.S.C. § 1391 "eliminated the separate consideration of venue based upon whether the Court's jurisdiction was based upon diversity of citizenship or *subject matter jurisdiction*." Pl. Opp. at 14 (emphasis added). That is not quite correct. The Act eliminates the distinction between certain venue criteria in diversity of citizenship and *federal question* cases. "[T]he Act combines the venue provisions for federal question and diversity of citizenship cases into a unified provision. No longer does § 1391(a) prescribe venue for diversity of citizenship and § 1391(b) for federal question cases. Instead, the venue choices for all applicable civil actions are unified at 28 U.S.C. § 1391(b)." WRIGHT MILLER & COOPER, Federal Practice and Procedure: Jurisdiction 3d § 3804 (Supp. 2013). However, the Act only applies to cases filed after January 6, 2012. *Id.* This case was filed on January 3, 2012. *See* ECF No. 1. Accordingly, the 2011 Amendments technically do not apply here. Because the Complaint pleads federal subject matter jurisdiction pursuant to both diversity of citizenship, 28 U.S.C. § 1332, and the presence of a federal question, 28 U.S.C. § 1331, *see* AC at 3, the version of § 1391(b) quoted above would be the applicable provision. Like the current version of §1391(b), the prior version provides for venue in either (1) a judicial district where any defendant resides, if all defendants reside in the same state, or (2) a district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated. In other words, the Act's amendments would change the analysis *only* if I were to rely on § 1391's "fallback provision," which provides for venue in cases where neither of the primary venue criteria are satisfied. While the criteria of § 1391(a) and (b) were streamlined and combined, only the "fallback

9

First, venue would be proper in "a judicial district where any defendant resides, if all defendants reside in the same State." 28 U.S.C. § 1391(b)(1). The Plaintiffs' residence is irrelevant to that inquiry. *See* WRIGHT & MILLER § 3805. According to both parties' pleadings, the Radwans are residents of California, though no facts in support of this conclusion—such as the address of their domicile—are provided.[7]  Both Cortez Holding and Cortez LLC are incorporated in Florida, but maintain a principal place of business in Mission Viejo, California. *See* AC at 2. While neither party offers an argument on this point,[8]

---

provision" (now § 1391(b)(3)) was amended substantively by the 2011 Act. And, as both principal criteria apply here, there is no reason to rely on that "fallback" provision. Accordingly, as applied to this case, the 2011 amendments create a distinction without a difference.  References to §1391(b) throughout this Opinion should be understood as referring to the applicable, pre-amended version of the statute.

[7]      Before the 2011 Act, "the great bulk of authority . . . appli[ed] the same test of domicile in determining a party's "residence" for venue purposes as is applied in determining a party's "citizenship" for jurisdictional purposes." WRIGHT & MILLER § 3805. This majority view was codified by the 2011 Act which amended §1391(c) to provide:

> Residency.--For all venue purposes--
>      (1) a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled.

28 U.S.C. § 1391(c)(1) (2012).

[8]      Both parties erroneously submit that the first prong of §1391(b) is not applicable in this case. Defendants miscite the statute, submitting that "venue can be proper in a judicial district where any defendant resides, if all defendants reside in the same district." Def. MTD at 14. However, the statute plainly provides that all defendants need only reside in the *same state*, not the same district (not an issue in single-district New Jersey, but an issue in other states). *See* WRIGHT & MILLER § 3804 ("The first venue criterion in both diversity and federal question cases is now the residence of the defendants. For this criterion to be satisfied, all defendants must reside in the same state, but if they do, venue is proper in any district in which any defendant resides."). Corporate entities, such as Cortez Holding and Cortez LLC, may be residents of more than one state if they have sufficient contacts there. In most cases, the district where an entity is incorporated and the district where, for example, it maintains its principal place of business will furnish sufficient minimum contacts. *See* WRIGHT & MILLER § 3811.1 ("The place where the corporation is incorporated is almost certainly a place in which it is subject to jurisdiction, and a place where it is licensed to do business may meet the test of the present statute. . . . [T]he facts of incorporation or license to do business merely are factors in determining whether the

10

it is likely that these corporate entities would be considered residents of both the Southern District of Florida and the Central District of California because they have sufficient minimum contacts with both of those districts.[9] *See Estate of Antonious v. Yonex Corp. USA*, 2009 WL 1346617 (D.N.J. May 13, 2009) ("A corporation is said to reside "in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."). Accordingly, the Central District of California, where Mission Viejo is located, would provide a proper venue for this action because at least two of the Defendants (Cortez Holding and Cortez LLC) reside in that district and *all* defendants are residents of the State of California. *See* 28 U.S.C. § 1391(b)(1) (venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located").

Second, venue would be proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). There is no dispute that "a substantial part of property that is the subject of the action is situated" in Fort Lauderdale, the county seat of Broward County, which is located in the Southern District of Florida. The real property owned by Cortez LLC, including additional properties the Radwans allegedly purchased without Plaintiffs' consent, is located in Broward County.

---

corporation is subject to personal jurisdiction . . . ."). Plaintiffs, on the other hand, submit that "The only section of the current rule that applies to this case is 28 U.S.C. § 1391(b)(2)," but they do not explain why § 1391(b)(1) is inapplicable. *See* Pl. Opp. at 14.

[9]     The 2011 Act altered slightly the definition of corporate residency, but retained the primary criterion that a corporate entity is "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." § 1391(c) (2011). *Compare* § 1391(c)(2) (2012):

    Residency.--For all venue purposes--
    . . .
    (2) an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business.

11

Defendants also submit that a "substantial part of the events or omissions giving rise to the claim" occurred in Broward County and that it is the most convenient location for resolution of this dispute.

> This action is inextricably tied to a real estate development in Southern Florida and should be transferred there. . . . Indeed, there is no reason to consider New Jersey as a forum as the Investors' capital contributions were sent from Saudi Arabia and Kuwait to Florida, the property is located in Fort Lauderdale, Florida; and the site plan processing and delays, which appear to have created the concerns, all took place in Fort Lauderdale, Florida. Further, transferring this action to Florida would be more convenient as the vast majority of witnesses, some of whom are likely to include employees and agents of the Planning Department of the City of Fort Lauderdale, the Defendants, and the evidence are located in Florida.

Def. MTD at 16.

Plaintiffs do not dispute that the Southern District of Florida might provide one appropriate venue for this action. They argue, however, that New Jersey is a proper venue as well. Section 1391(b)(2) requires only that "a substantial part of the events giving rise to the plaintiffs' claims" occurred in New Jersey in order for venue to properly lie here. Plaintiffs allege that "during the course of negotiations, Talat Radwan and a representative and authorized agent of Shairco had various meetings in the State of New Jersey to discuss the prospect of joining in the venture" and that, because of Talat's representations during these meetings, the Plaintiffs invested $12 million USD. These events, plaintiffs say, constitute "a substantial part of the events giving rise to the plaintiffs' claims." *See* Pl. Opp. at 15.

Plaintiffs are correct that "there can be more than one district where 'a substantial part of the events may occur.'" *Id.* at 14. The test still requires, however, that the New Jersey events or omissions have been "substantial." Opining on § 1391 following the Judicial Improvements Act of 1990, the Third Circuit explained,

> The amendment changed pre-existing law to the extent that the earlier version had encouraged an approach that a claim could generally arise in only one venue. However, the current statutory language still favors the defendant in a venue dispute by requiring that the events or omissions supporting a claim be "substantial." Events or omissions that might only have some tangential connection with the dispute in litigation are not enough.

12

> Substantiality is intended to preserve the element of fairness so
> that a defendant is not haled into a remote district having no real
> relationship to the dispute.

*Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 294 (3d Cir. 1994).
Surveying a handful of cases decided by sister circuits, the Court concluded:
"The test for determining venue is not the defendant's 'contacts' with a
particular district, but rather the location of those "events or omissions giving
rise to the claim," theoretically a more easily demonstrable circumstance than
where a "claim arose." Although the statute no longer requires a court to select
the "best" forum, the weighing of "substantial" may at times seem to take on
that flavor." *Id. Accord Bockman v. First Am. Mktg. Corp.,* 459 F. App'x 157,
161 (3d Cir. 2012); *Leone v. Cataldo,* 574 F. Supp. 2d 471, 483 (E.D. Pa. 2008).
In addition, the Third Circuit instructed that when "assessing whether events
or omissions giving rise to the claims are substantial, it is necessary to look at
the nature of the dispute." *Cottman Transmission Sys.,* 36 F.3d at 295.

The overwhelming majority of events or omissions giving rise to the
Plaintiffs' claims did not occur in New Jersey. And those that did allegedly
occur here do not rise to the level of "substantial" events or omissions when
considered in the context of this dispute.

To establish venue, Plaintiffs rely extensively on allegations of misleading
comments made by the Radwans during meetings with Alshair in New Jersey.
With regard to Talat, Plaintiffs allege:

> [T]here were numerous discussions/negotiations between [Alshair]
> himself and [Talat] Radwan about the Shairco project in New
> Jersey.[10]  Radwan was well aware that Mr. Alshair was based in
> Edgewater, having visited and even stayed at his apartment. He
> knew that New Jersey was the center of operations for Mr. Alshair
> and for Shairco, and he came here as frequently as necessary to
> solicit its business. During 2007, he used those occasions to
> discuss and negotiate terms of the Cortez project.
>         Even after 2007, Radwan came to New Jersey not only to
> solicit new business from Shairco, but to discuss the Cortez project
> – and to discuss it in such a way as to create the false impression
> that the project was proceeding in a normal way, albeit in the face
> of certain problems with the real estate market. Radwan did
> everything he could to keep Mr. Alshair from asking the difficult

---

[10]     I make the plaintiff-favorable assumption that this "Shairco project" is the same
project referred to later in the same paragraph as the "Cortez Project," which is the
subject of this litigation.

questions which would have brought to light the defendants'
fraudulent conduct, and the theft of the plaintiffs' $12,000,000.

Pl. Opp. at 10-11. *See also id.* at 15-16.

With regard to Jason, Plaintiffs allege:

> [D]uring the protracted period in which the defendants were
> furthering their scheme while at the same time trying to conceal it,
> Jason Radwan came to New Jersey to meet with Mr. Alshair. In
> addition to trying, as his father also did, to mollify Shairco by
> persuading Alshair that the Cortez project was proceeding
> normally, he also tried to convince Alshair to let him use money for
> the Cortez project for some type of mortgage foreclosure venture.
> Mr. Alshair unconditionally refused; yet in a subsequent email,
> Radwan informed the plaintiffs that he had done just that.

*Id.* at 12.

These conclusory allegations do not establish a "substantial event" that
gave rise to Plaintiffs' claim. Most of the allegations seem to involve
conversations "about" the project when it was underway, or unsuccessful
attempts to persuade Alshair to authorize alternative investments. As
discussed above, Plaintiffs have not substantiated, or even clarified, their
allegations that "numerous discussions/negotiations" related to the Cortez
Project took place in New Jersey. Nor have Plaintiffs provided any details of the
discussions that led to the alleged perpetration of the "critical aspect of the
scheme." In short, these allegations are little more than bare conclusions; the
when, the where, and the what are missing.

Plaintiffs acknowledge that they invested $12,000,000 to purchase a
hotel site in Florida, that they did so willingly pursuant to the terms of a Joint
Operating Agreement, and that the real property they invested to purchase was
in fact purchased by and remains under the ownership of Cortez LLC. Plaintiffs
do not make any credible, fact-based allegation that the Radwans' intention,
from the beginning, was to solicit funds to be used for ulterior purposes.
Rather, the gravamen of Plaintiffs' claim, as currently pleaded, is that the
Radwans, acting as Cortez Holding, failed to comply with their obligations
under the Agreement (i.e. they never invested their $6,000,000 share, or used
it for unauthorized purposes, and failed to provide an accounting of the
partners' investments), and that they subsequently mismanaged the
investment, thus breaching the terms of the Agreement and their fiduciary duty
to the Plaintiffs. (The fiduciary obligation is said to arise "as a matter of
contract and as a matter of law." AC at 27).

14

Consideration of Plaintiffs' allegations as breach of contract claims requires consideration of the location of the contract's negotiation, execution and performance, the location of property governed by the contract, and the location of the breach. *See Cottman Transmission Sys.,* 36 F.3d 291 at 295; *Leone,* 574 F. Supp. 2d at 484 ("In determining whether a substantial part of the acts giving rise to a contract claim occurred in a district, a court should consider where the contract was negotiated, executed, and performed and where the breach occurred."). Neither Party's pleadings indicate where and when material contract negotiations took place, or where the Agreement was finally executed; in any event, no one alleges that these events occurred in New Jersey. Facts regarding the participation of Al-Ghena, the Kuwaiti entity and third party to the Agreement, are also notably absent from the pleadings. Some critical portion of the contract negotiations and certainly the contract's execution must have involved Al-Ghena, which is not alleged to have any ties to New Jersey or to have participated in meetings in New Jersey. The Agreement was performed in Florida, where the real property was purchased. The location of the breach, while perhaps harder to pinpoint, is Florida or California since the Radwans' alleged failure to remit their full share of the investment and their subsequent mismanagement of funds must have occurred in one of those two places. New Jersey is not even in contention.

Consideration of Plaintiffs' allegations as claims of fraud or misrepresentation does not transform the District of New Jersey into a proper venue. Plaintiffs vaguely allege that the Defendants used meetings with Alshair in New Jersey to "create the false impression that the project was proceeding in a normal way," but according to the Plaintiffs' pleadings, Defendants' misrepresentations and stonewalling about the status of the Cortez Project and the use of Plaintiffs' funds *after* the investment was made occurred electronically, primarily through email correspondence sent to Plaintiffs, and later to Plaintiffs' attorney, Jeffrey Bronster, by Jason, presumably acting from California. *See* AC at 11-15 and Appendix. The alleged later misrepresentations, to the extent they exist, are unrelated to Plaintiffs' physical location, which, even by Plaintiffs' account, was *not* New Jersey more than 75% of the time in Mr. Alshair's case and perhaps 100% of the time in Al-Ghena's case. While the office of the attorney, Mr. Bronster, is located in New Jersey, Jason's electronic responses to Bronster, even coupled with the emails directed at Plaintiffs' unspecified locations, do not amount to a "substantial occurrence" in New Jersey. *See Loeb v. Bank of Am.*, 254 F. Supp. 2d 581, 587 (E.D. Pa. 2003) (finding correspondence, telephone calls, and even "impact of economic harm" to be "woefully insufficient to establish venue in this district").

Consideration of Plaintiffs' claims as RICO allegations does not change the picture. The Complaint alleges as racketeering activity two acts of wire fraud in violation of 18 U.S.C. § 1343:[11]

> On September 18, 2008, Jason Radwan sent an email to the plaintiffs, attaching a letter on his company's letterhead from "John Briggs," in order to perpetuate the fraud that the plaintiffs' twelve million dollars was being used in the manner that the plaintiffs had been told, and for the purpose that the plaintiffs had authorized.
>
> On April 6, 2010, Jason Radwan and Talat Radwan sent an email to the plaintiffs, sent from Jason's email address and attaching a letter authored by Talat, which was sent in order to perpetuate the fraud that the plaintiffs' twelve million dollars was being used in the manner that the plaintiffs had been told, and for the purpose that the plaintiffs had authorized.

AC at 21. There is no indication that these alleged fraudulent representations originated from or caused substantial effects in New Jersey; rather it appears that they originated in California and perhaps caused effects wherever the Plaintiffs were physically located at the time they received the email.

In any event, the federal RICO Statute has its own specific venue provision which provides: "Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a) (West). "A person transacts his affairs within a particular district when he regularly conducts business of a substantial and continuous nature within that district." *Kunkler v. Palko Mgmt. Corp.*, 992 F. Supp. 780, 781 (E.D. Pa. 1998) (internal citation omitted).

_____

[11]    "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1343.

As discussed in more detail below, *see* § II.C.i., the Defendants' business in New Jersey cannot be described as "substantial and continuous."

In short, if the handful of New Jersey discussions between the Radwans and Alshair were eliminated from the pleadings, the critical elements of the Plaintiffs' claim would not be appreciably altered or affected. The vaguely-described meetings and misrepresentations that allegedly occurred in New Jersey are not particularly germane to the Plaintiffs' claims and therefore do not constitute "substantial events or omissions." *See Cottman Transmission Sys.,* 36 F.3d 291, 294 ("Events or omissions that might only have some tangential connection with the dispute in litigation are not enough."); *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 357 (2d Cir. 2005) ("for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere"). The Agreement, which was the foundation of the Parties' relationship and any abuse thereof, seemingly was negotiated and executed elsewhere; the investment money was sent to Florida to purchase property located in Florida; the financing and permits that stalled the project originated in Florida; the misrepresentations regarding the status of the project and the use or misuse of the investment funds were made via email from California; subsequent alleged illicit use of the investment funds likely occurred from California and Florida; the books and records that were never turned over or never existed in the first place would or should have been generated or located in California or Florida.

Accordingly, I cannot conclude that the District of New Jersey is a proper venue for this action. The question then becomes whether dismissal or transfer is appropriate, and, if transfer, to which proper venue.

## B. Transfer or Dismissal

If a court determines that venue has been improperly laid within its district, § 1406(a)[12] provides the court with the discretion to transfer the case or dismiss it. "Dismissal is considered to be a harsh remedy … and transfer of venue to another district court in which the action could originally have been brought, is the preferred remedy." *See NCR Credit Corp.* 17 F. Supp. 2d at 319 (D.N.J.1998) (citing *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466 (1962)); *United States v. Berkowitz,* 328 F.2d 358, 361 (3d Cir. 1964) ("'The language of § 1406(a) is amply broad enough to authorize the transfer of cases . . . whether

---

[12] "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

the court in which it was filed had personal jurisdiction over the defendants or not.") (quoting *Goldlawr*, 369 U.S. at 466–67)). "The decision whether to transfer an action rests in the sound discretion of the trial court." *Plum Tree, Inc. v. Stockment,* 488 F.2d 754, 756 (3d Cir.1973).

While it is generally recognized that a plaintiff's choice of forum should be honored, that choice must be one among the permissible options. The District of New Jersey does not meet the requirements of either § 1391(b)(1) or (b)(2) and therefore, despite Plaintiffs' clearly expressed choice, cannot be considered. As between the Central District of California and the Southern District of Florida, Plaintiffs have not expressed a preference. Defendants, however, submit, and I too agree, that the balance of factors in this case weighs in favor of transfer to the Southern District of Florida.

In order to choose the proper venue for this action, the Court is guided by the public and private interests weighed in this Circuit by courts considering a § 1404[13] motion for permissive transfer.

> The private interests have included: plaintiff's forum preference as manifested in the original choice, whether the claim arose elsewhere, the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).
>
> The public interests have included: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion, the local interest in deciding local controversies at home; the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases.

*Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879-80 (3d Cir. 1995).

---

[13] "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

Many of these factors have already have been discussed at length—for example, the location of the real property and investments, the events that precluded financing and development of the project, the location of witnesses, including Fort Lauderdale city officials, and the location of books and records (not only those of Cortez Holding and Cortez LLC, but also city records). They point to Florida as the more appropriate venue for this action. Defendants also argue that "Florida has an interest in enforcing contracts that invoke its law," that "the actions of the Fort Lauderdale City Commission are likely to be very relevant to the issues to be resolved," and that "the judges of the Southern District of Florida are familiar with issues pertaining to the unfortunate and significant decrease in development activity regarding Florida real estate."  Def. MTD at 17.

Plaintiffs, by maintaining a singular focus on New Jersey, have glossed over many of these important considerations. They maintain that "the majority of the public considerations listed in *Jumara* do not appear to be implicated in this lawsuit," and that it is yet unclear "what state's laws will apply to this case."  However, if any forum has a vested interest in this matter, it would be the state of Florida, considering that the stalled multi-million dollar real estate project is located there. If, as alleged, the Radwans are using Florida real estate as a vehicle for their alleged fraudulent activity, that would certainly be of "local interest" to the Florida courts. And while it has not yet been determined which state's laws will apply to each of Plaintiffs' causes of action, it is clear that Florida law will play a major role. The Operating Agreement provides that it "shall be construed and enforced in accordance with the internal laws of the State of Florida," and Plaintiffs have asserted several claims under the Florida Civil Remedies for Criminal Practices Act, FLA. STAT. § 772.103.

Plaintiffs also point out that Florida is no more of a "convenient" forum for Defendants than New Jersey since the Defendants are residents of California, and thus, either venue in Florida or New Jersey would require their cross-country travel. Plaintiffs, again, do not mention Al-Ghena and the convenience of its representative, but rather argue that Alshair's presence in New Jersey three to four months per year establish that this State is a convenient forum. For all of the reasons discussed above, Alshair's forum preference and convenience cannot overcome the other considerations at play here.

I find, on balance, that the Southern District of Florida is the most convenient and appropriate venue for this action and it shall therefore be transferred accordingly.

### C. Personal Jurisdiction over the Defendants

Many of the same considerations that inform my venue analysis indicate that, even if this action were to remain in the District of New Jersey, I would be compelled to dismiss it for lack of personal jurisdiction over the Defendants. For completeness, I briefly discuss this as an alternative ground for dismissal or transfer of venue.

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing sufficient facts to show that jurisdiction exists. *Marten v. Godwin*, 499 F.3d 290, 295-96 (3d Cir. 2001). Initially, a court must accept the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff, *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002), but the court must still examine any evidence presented with regard to disputed factual allegations. *See, e.g., Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 155-56 (3d Cir. 2010) (examining the evidence supporting the plaintiff's allegations); *Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990) ("'A Rule 12(b)(2) motion, such as the motion made by the defendants here, is inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence.'") (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)).

The plaintiff "need only establish a prima facie case of personal jurisdiction." *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir. 2004). However, a plaintiff may not "rely on the bare pleadings alone" in order to withstand a motion to dismiss for lack of personal jurisdiction; "[o]nce the motion is made, plaintiff must respond with actual proofs, not mere allegations." *Patterson*, 893 F.2d at 604 (internal citations omitted); *Time Share Vacation Club*, 735 F.2d at 66 n.9.

To assess whether it has personal jurisdiction over a defendant, a district court must undertake a two-step inquiry. *IMO Indus., Inc. v. Kiekert, AG*, 155 F.3d 254, 259 (3d Cir. 1998). First, the court is required to use the relevant state's long-arm statute to see whether it permits the exercise of personal jurisdiction. *Id.*; Fed. R. Civ. P. 4(k). "Second, the court must apply the principles of due process" under the federal Constitution. *WorldScape, Inc. v. Sails Capital Mgmt.*, Civ. 10-4207, 2011 WL 3444218 (D.N.J. Aug. 5, 2011) (citing *IMO Indus.*, 155 F.3d at 259).

In New Jersey, the first step collapses into the second because "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Miller Yacht Sales*, 384 F.3d at 96 (citing N.J. Ct. R. 4:4-4(c)). Accordingly, personal jurisdiction over a non-resident defendant is proper in this Court if the defendant has "'certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 316 (1945)).

There are two kinds of personal jurisdiction that allow a district court to hear a case involving a non-resident defendant: general and specific. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414-415 & n. 9 (1984). A court may exercise general jurisdiction when a defendant has "continuous and systematic contacts" with the forum state. *Id.* at 415 n. 9. The defendant's "contacts need not relate to the subject matter of the litigation," *Ameripay, LLC v. Ameripay Payroll, Ltd.*, 334 F. Supp 2d 629, 633 (D.N.J. 2004), but must rise to "a 'very high threshold of business activity.'" *Id.* at 633 (quoting *Compagnie des Bauxites de Guinea v. Ins. Co. of N. America*, 651 F.2d 877, 891 (3d Cir. 1981)). The facts required to establish sufficient contacts for general jurisdiction must be extensive and persuasive. *Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas*, 675 F.2d 587, 589 (3d Cir. 1982). In other words, the plaintiff must demonstrate "significantly more than minimum contacts." *Provident Nat'l Bank*, 819 F.2d at 437.

In contrast to general jurisdiction, specific jurisdiction relies on the defendant's forum-related activities that give rise to the plaintiff's claims. *See Helicopteros*, 466 U.S. at 413-14. Establishing specific jurisdiction requires a three-part inquiry: (1) whether the defendant purposefully directed its activities at the forum; (2) whether the litigation arises out of or relates to at least one of the contacts; and (3) whether the exercise of jurisdiction otherwise comports with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007). The defendant need not be physically located in the state while committing the alleged acts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Nor is specific jurisdiction defeated merely because the bulk of harm occurred outside the forum. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984). A single act may satisfy the minimum contacts test if it creates a substantial connection with the forum. *Burger King*, 471 U.S. at 476 n. 18.

### i. *General Jurisdiction*

#### 1. Talat Radwan

Plaintiffs allege that Talat "has been coming to and involved with the state of New Jersey for years." Pl. Opp. at 10. As discussed above, Plaintiffs maintain that, prior to the Cortez Project, Talat approached Alshair about investing in two New Jersey real estate projects—the Voorhees Project in 2004[14] and the Edgewater Project in 2007[15]—and that Talat traveled to New Jersey at least once in connection with each of these projects. *Id.* Plaintiffs also allege that Talat's investment company at the time, "the Affinity Financing project," developed a marketing brochure with "Talat Radwan's name prominently featured along with maps of Southern New Jersey, where the venture was located." *Id.*

According to Plaintiffs' allegations, neither Talat nor his investment company ever actually made those investments in New Jersey, nor did New Jersey residents or entities invest with Talat as a result of his activities directed at the forum. Two visits over a three year-period and a single brochure that yielded no actual investment activity hardly amount to a "very high threshold of business activity." *See Leja v. Schmidt Mfg., Inc.*, 743 F. Supp. 2d 444, 452 (D.N.J. 2010) (where defendant solicited business in New Jersey by sending various mailings, sold to six New Jersey distributors, sent sales representatives on two business trips to New Jersey and maintained fax and email contact with New Jersey customers, court applied the "solicitation plus" test which "is predicated on the idea that business activities which constitute "nothing more than ... solicitation" are "not enough to bring the defendant within the district" in which the solicitation occurred for the purposes of [general] personal jurisdiction" and found no personal jurisdiction over defendant) (citing *Green v. Chicago, Burlington & Quincy Ry. Co.*, 205 U.S. 530, 533–34 (1907)); *Nautilus Ins. Co. v. Green Eye Tech., LLC*, 2012 WL 5451808 (E.D. Pa. Nov. 8, 2012) ("sporadic business connections to Pennsylvania fall far short of the "continuous and systemic contacts" required to justify a court's assertion of general jurisdiction.").

The Cortez Project, while resulting in monetary investment, has no significant ties to New Jersey, other than the fact that one of its investors spends "on average . . . three to four months a year living in New Jersey." Alshair Aff. ¶ 10. The entity that is a New Jersey resident, Shairco NJ, was not in existence until 2011 and is not a signatory to the Agreement. Al-Ghena, the

---

[14]    Defendants maintain that all discussions regarding the Voorhees project (which never materialized) occurred in Saudi Arabia. *See* Def. Reply at 6.

[15]    Defendants maintain that this project, referred to by the Parties as the "Moorings project," was actually initiated by Mr. Alshair and his colleague at Smart Realty who solicited Talat's participation and invited him to come to New Jersey to visit the property, rather than the other way around as Plaintiffs suggest. *See* Def. Reply at 5-6.

Kuwaiti entity, has no alleged ties to New Jersey, nor is it alleged that an Al-Ghena representative participated in discussions that occurred in New Jersey.

While "physical entrance [into the forum] is not required . . . what is necessary is a deliberate targeting of the forum . . . [a]nd contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself." *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007). Thus, if the Plaintiffs were not in New Jersey or even New Jersey residents when a majority of critical Cortez Project conversations took place, the Florida-based Cortez Project, standing alone, cannot provide the predicate of "continuous and systematic contacts" with New Jersey. *See Marten v. Godwin*, 499 F.3d 290, 298 (3d Cir. 2007) ("a plaintiff's residence is relevant to the "jurisdictional inquiry" insofar as residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum. However, the state of a plaintiff's residence does not on its own create jurisdiction over nonresident defendants.") (internal quotations and citation omitted).

Finally, it is axiomatic that neither the unilateral activities of Mr. Alshair / Shairco in New Jersey, nor Mr. Alshair's unilateral expectation that his involvement in any U.S. litigation would occur in New Jersey, are relevant to this jurisdictional analysis. *See Hanson v. Denckla,* 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. . . . [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."); *accord O'Connor*, 496 F.3d at 317 ("unilateral activity of those who claim some relationship with a nonresident defendant" is insufficient). It is the Defendant's contacts with a forum state that must create a reasonable expectation of being haled into court in that forum and therefore it is the Defendant's activities that must inform and control the jurisdictional analysis. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980) ("it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there"); *Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano Cnty.*, 480 U.S. 102, 112, (1987) ("The substantial connection between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*.") (internal quotation and citation omitted); *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 63 (3d Cir. 1984) ("Essentially, before hearing a case, a court must ask whether "the quality and nature of the *defendant's* activity is such that it is reasonable and fair to require [that it] conduct [its] defense in that state."

23

*Kulko v. Superior Court of California*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978)).

Accordingly, this Court cannot assert general personal jurisdiction over Talat Radwan.

### 2. Jason Radwan

Plaintiffs assert that Jason's occupation as a professional baseball player required his attendance in New Jersey for games "a significant number of times" over a two year period. *See* Pl. Opp. at 11. Plaintiffs' maintain that this is significant because Jason was "coming to New Jersey on a regular basis to pursue his livelihood, just as much as if he was engaged in corporate business activities." *Id.* However, these allegations rest on the conclusory statement that Jason was in New Jersey on business "a significant number of times" without providing a single date or other detail in support. The extent of Plaintiffs' evidence is information on the Canadian-American baseball league downloaded from the internet that includes league statistics for a number of teams, including the Broxton Rox, Jason's Massachusetts-based team. *See* Alshair Aff. Exs. B and C. This information indicates that there were New Jersey teams in the league but it does not support Plaintiffs' allegation that Jason was in fact in New Jersey pursuing business activities "a significant number of times" over a seven year period.

Regardless of how many times Jason's league happened to schedule baseball games in New Jersey and how many of those games Jason actually attended,[16] "to establish either general or specific jurisdiction, a [Plaintiff] must show that each of the defendant's relevant contacts with the forum are shaped by purposeful conduct making it reasonable for the defendant to anticipate being haled into court here. *Bartolomei v. Twin Ponds Family Recreation Ctr.*, 2006 WL 3694601, *1 (D.N.J. Dec. 13, 2006) (citing *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)). Jason's presence in New Jersey to play baseball was not an act of purposeful availment, as is constitutionally required, but rather the result of his team's schedule, over which he exercised no control. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (the "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated

---

[16]     According to the Alshair Affirmation, the internet schedules indicate that, "in 2007, the Canadian-American Association was a ten-team league, with a team known as the Jackals located in New Jersey," that "Jason played in 63 games for Broxton in 2007 and in 92 games for Broxton in 2006," and that while Mr. Alshair "could not determine exactly how many games Jason played in New Jersey, it is clear that he came here often *on the business of his team* . . . ." *Id.* ¶¶ 33-35 (emphasis added).

24

contacts, or of the unilateral activity of another party or a third person.") (internal quotations and citations omitted). New Jersey was no more of an intentional business destination for Jason than New York, Connecticut, or Quebec where it appears the League's teams also played. *See, e.g., Westway Holdings Corp. v. Tate & Lyle PLC,* 2008 WL 4443052 (E.D. La. Sept. 25, 2008) (noting that the Fifth Circuit has held that "when the contacts and activity of the defendant would have been the same in any other state, then such contacts are a mere fortuity."). Nor is there any indication that Jason fostered contacts with New Jersey or New Jersey citizens as a result of his baseball activities here.

According to Plaintiffs' reasoning, Jason (or any other athlete who plays interstate sports) reasonably should expect to be haled into court in any state in which he plays. But, for the reasons expressed above, this is not "purposeful availment" sufficient to subject him to suit here on activities unrelated to baseball. *Cf. Burger King Corp,* 471 U.S. at 475; *cf. Guyton v. A.M. Gen.,* 2001 WL 1623411 (E.D. Pa. Dec. 17, 2001) ("where a defendant has deliberately created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there") (citing *Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 648 (1950)).

Accordingly, this Court cannot assert general personal jurisdiction over Jason Radwan.

## ii. *Specific Jurisdiction*

In determining whether the court can assert jurisdiction over a defendant, "[i]dentifying some purposeful contact with the forum is but the first step in the specific-jurisdiction analysis. The plaintiffs' claims must also 'arise out of or relate to' at least one of those contacts." *O'Connor,* 496 F.3d at 318. Thus, while not identical, the specific jurisdiction analysis considers many of the same factors required for determining proper venue, particularly where, as here, both questions turn on the substantiality of events occurring in the forum. Also as with the venue analysis, "specific personal jurisdiction generally must be evaluated in both a claim-specific and defendant-specific fashion." *Lexington Ins. Co. v. Forrest,* 354 F. Supp. 2d 549, 551 (E.D. Pa. 2005) (citing *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 94 n. 1 (3d Cir.2004); *Remick v. Manfredy,* 238 F.3d 248, 255-56 (3d Cir.2001); *Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980)). The Complaint charges the Defendants with various counts of racketeering, "in the states of New Jersey, Florida, California, and elsewhere," AC at 19, as well as fraud, conversion, conspiracy, breach of fiduciary duty, and unjust

enrichment. AC at 25-27. It also seeks affirmative injunctive relief, largely relating to an accounting.[17] AC at 18.

The Third Circuit "has never adopted a definitive approach to the relatedness requirement." Nonetheless, "[i]n contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *Id.* at 320. With regard to tort claims, the Circuit has eschewed any hybrid or sliding scale approach. *Id.* at 321. Instead, the Third Circuit has opted for an enhanced "but-for-test," reasoning that such a test "at least makes an attempt to preserve the distinction between general and specific jurisdiction [and] draws a bright line separating the related from the unrelated. . . . More importantly, by ensuring the existence of some minimal link between contacts and claims, but-for causation provides a useful starting point for the relatedness inquiry." *Id.* at 322. The "but-for-test" alone, however, is overinclusive; thus, the Third Circuit has held that "specific jurisdiction requires a closer and more direct casual connection than that provided by the but-for-test. . . . The casual connection can be somewhat looser than the tort concept of proximate causation, but it must nonetheless be intimate enough to keep the quid pro quo[18] proportional and personal jurisdiction reasonably foreseeable." *Id.* at 324. In contract cases, the approach is somewhat simpler: "courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *See id.* at 320 (citing *Gen. Elec. Co. v. Deutz AG,* 270 F.3d 144, 150 (3d Cir. 2001)).

### 1. Tort Claims

---

[17]    Before this Court can enjoin or compel the Defendants' actions, Plaintiffs must establish with "reasonable probability" that the Court has personal jurisdiction over the Defendants. *See Weitzman v. Stein,* 897 F.2d 653, 659 (2d Cir. 1990) ("The district court has no power to grant an . . . injunction against a party over whom it has not acquired valid jurisdiction. Further, a prima facie showing of jurisdiction will not suffice.") (internal quotations and citations omitted); *accord United States v. First Nat. City Bank,* 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property"); *Epsilon Plastics, Inc. v. Goscin,* 2006 WL 776802, *5 (D.N.J. Mar. 24, 2006).

[18]    "With each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations. Specific jurisdiction is the cost of enjoying the benefits. The relatedness requirement's function is to maintain balance in this reciprocal exchange. In order to do so, it must keep the jurisdictional exposure that results from a contact closely tailored to that contact's accompanying substantive obligations." *O'Connor,* 496 F.3d at 323.

26

The baseline inquiry for Plaintiffs' tort claims is but-for-causation. While Plaintiffs' brief and the Alshair Affirmation attempt to establish some link between the Radwans' actions directed at New Jersey and the Plaintiffs' common law tort claims, they do not pass the "but-for-test." Still less do they establish a "direct casual connection" between a purposeful contact and Plaintiffs' claims.  Plaintiffs rely on the allegation that the Radwans made misleading statements during discussions with Alshair in New Jersey both before and after the Plaintiffs invested in the Cortez Project. As established in the venue analysis, above, these allegations fail to establish that the Radwans directed fraudulent activity at New Jersey.

Plaintiffs allege that Talat's meetings with Alshair in New Jersey were critical to convincing Alshair to invest in the Cortez Project. This allegation lacks a factual backbone, and, in the larger context, does not amount to fraud or a material misrepresentation.  *See* discussion *supra* at II.A.  The vague allegation that Defendants created "the false impression that the project was proceeding in a normal way" cannot be considered activity purposefully directed at New Jersey. Most of the communications occurred electronically and had no purposeful connection to New Jersey. The correspondence is deemed fraudulent largely because it omits information or fails to obtain Plaintiff's consent to alternative investments. (I note, however, that in 2009 Jason allegedly disclosed to Alshair his plans for an alternative use of the investment funds. *See* Pl. Opp. at 7; Alshair Aff. ¶¶ 53-54. Whatever else this was, it was not  a fraudulent failure to disclose; it seems to relate primarily to questions of contract interpretation and breach.) Plaintiffs allege that "the Radwans provided little actual information on the project, or on the status of the investment money. What the Radwans did do was provide just enough 'information' to assure the plaintiffs that the project was proceeding as it should, albeit in the face of certain economic problems caused by external factors." Pl. Opp. at 3. Plaintiffs do not describe any "information" the Radwans used to mislead them, but they admit that they were aware of the "economic problems caused by external factors" the project was facing. *Id.* The problems in identifying New Jersey as the particular place where disclosure did *not* occur are apparent.

### 2. Racketeering

The racketeering allegations of the Complaint, including the appendix of supporting documentation, do not contain a single factual allegation specifically tied to New Jersey. The Complaint simply alleges generally that Defendants' racketeering activity occurred in New Jersey and elsewhere.

While the Third Circuit has found that a RICO claim "can be said to arise out of informational communications that are critical to the maintenance of the

27

enterprise at the center of the RICO conspiracy," those communications must be directed at the forum in question. *Compare Lexington Ins. Co.*, 354 F. Supp. 2d at 552 (E.D. Pa. 2005) (finding that defendants' informational communications in furtherance of a RICO enterprise sent from London to plaintiffs located in Pennsylvania were sufficient to establish specific personal jurisdiction over defendants in Pennsylvania), *with Sunbelt Corp. v. Noble, Denton & Associates, Inc.*, 5 F.3d 28, 32 (3d Cir. 1993) ("informational communications in furtherance of [a] contract do not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over [a nonresident defendant]."). The allegations do not assert that the Plaintiffs were in New Jersey when they received Defendants' misleading emails, or that racketeering-related communications had any cognizable relationship with New Jersey.

### iii.   *Jurisdictional allegations related to Cortez Holding*

With regard to Cortez Holding, Plaintiffs maintain that because a corporation "acts only through its agents, officers, and employees," the relevant contacts are those of Talat and Jason Radwan—"the two people who from the inception controlled and directed the affairs of Cortez Holding," and who "came to New Jersey on multiple occasions to pursue the criminal venture of which the corporation was part and parcel."  Pl. Opp. at 13.

Plaintiffs' argument that a corporation acts only through persons is oversimplified. True, a corporation may maintain contacts with a state through its human agents. But corporations are themselves persons at law, which can sue and be sued. Corporations must be incorporated pursuant to the laws of a given state, maintain offices and registered agents, pay taxes and otherwise act as responsible citizens. These basic requirements ensure that the state of incorporation, the state of the corporation's principal place of business, and any other state where it conducts substantial business, will be deemed to satisfy the "minimum contacts" jurisdictional test. *See Rees v. Mosaic Technologies, Inc.*, 742 F.2d 765, 768 (3d Cir. 1984) ("Consonant with due process, personal jurisdiction may be asserted over a nonresident corporation so long as there exist "minimum contacts" between the corporation and the forum state. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *cf.* 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business"). The defendant corporation's conduct and connection with the forum State must be of such a nature that the corporation "should reasonably anticipate being haled into court there." *World-Wide Volkswagon Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)."); *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 371-72 (3d Cir. 2002) ("A foreign

corporation that purposefully avails itself of the American securities market has adequate notice that it may be haled into an American court for fraudulently manipulating that market."); *Bane v. Netlink, Inc.*, 925 F.2d 637, 640 (3d Cir. 1991) ("the qualification of a foreign corporation to do business is sufficient contact to serve as the basis for the assertion of personal jurisdiction"). The activities of the corporation itself, then—its place of incorporation, its offices, its business transactions—are highly critical to the jurisdictional inquiry. Cortez is not merely another name for the Radwans.

While the Radwans' activities *on behalf of* Cortez Holding may be relevant, a distinction must be drawn between their actions as agents and their personal action. The Plaintiffs have made no effort to draw such a distinction in their pleadings.[19]  They simply maintain that all of the Radwans' conversations with Alshair involved persuading him "to invest [his] family's money in one project or another."  Alshair Aff. ¶ 46.  That is insufficient to establish the nature and extent of the Radwans' activities as agents of Cortez.

The overwhelming majority of Plaintiffs' jurisdictional allegations are "no more than [] conclusory statement[s] which only restate[] an ultimate fact which [Plaintiffs] must prove. What is required, however, is actual evidence[.]" *Time Share*, 735 F.2d at 65. *See Reliance Steel Prods.*, 675 F.2d at 589 (3d Cir. 1982) (facts required to establish sufficient contacts for general jurisdiction must be extensive and persuasive).  Mr. Alshair states the need for "further research," Alshair. Aff. ¶49, but he should have control of the necessary information regarding the dates, times, and substance of meetings between himself and the Radwans. Absent at least a sufficient proffer, I will not assume that the jurisdiction-establishing facts are somewhere out there.

---

[19]   Plaintiffs have not argued for jurisdictional discovery, but state that that they are content to rely on their pleadings to establish specific jurisdiction over Cortez Holdings.  *See* Pl. Opp. at 12 and n.5. At any rate, Plaintiffs' pleadings do not suggest that jurisdictional discovery would be appropriate here. "Permitting jurisdictional discovery is appropriate when the existing record is 'inadequate' to support personal jurisdiction and a party demonstrates that it can supplement its jurisdictional allegations through discovery. To obtain jurisdictional discovery, [Plaintiffs] must establish with reasonable particularity sufficient contacts between the defendant and the forum state." *Am. Gen. Life Ins. Co. v. Berger*, 2011 WL 322649, *2 (D.N.J. Jan. 28, 2011) (internal quotations and citations omitted). Plaintiffs have not demonstrated that discovery is likely to yield evidence of additional contacts between the corporate Defendant and New Jersey.

### III.   Conclusion

I have reviewed the Amended Complaint and the Alshair Affirmation, and I have considered both in the light most favorable to the Plaintiffs. I find that they do not meet the requisites for venue under 28 U.S.C. § 1392(b). I also find that it is unlikely that the Court has personal jurisdiction over the Defendants. On the other hand, the Southern District of Florida appears to be the most appropriate venue for this action and it is very likely that it can exercise personal jurisdiction over the Defendants.

Accordingly,

**IT IS** this 16th day of July, 2013,

**ORDERED** that Defendants' Motion to Transfer Venue pursuant to Fed. R. Civ. P. 12(b)(3) is **GRANTED**; and it is further

**ORDERED** that this case shall be transferred to the United States District Court for the Southern District of Florida; and it is finally

**ORDERED** that Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED AS MOOT** in light of the transfer of venue.

HON. KEVIN MCNULTY
United States District Judge